1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHRISTOPHER WILLIAMS,

11             Plaintiff,                 No. CIV S-04-2515 FCD EFB P

12        vs.

13   ANDREASEN, et al.,

14             Defendants.               <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16        Plaintiff is a state prisoner proceeding *pro se* and *in forma pauperis* with a civil rights

17   action pursuant to 42 U.S.C. § 1983.  This matter is before the court on cross-motions for

18   summary judgment.   Plaintiff alleges in his November 29, 2004, complaint that defendants were

19   deliberately indifferent to his medical needs in violation of his Eighth Amendment rights.

20   Specifically, he alleges that while he was already prepped, anesthetized and about to be operated

21   on for defects in his spine, defendants interfered with and halted the scheduled surgery due to

22   budgetary reasons.  He further alleges months of unnecessary back pain because of the denial of

23   treatment.  Defendants argue that surgery was not approved by the Chief Medical Officer, a

24   defendant in this action, who had yet to receive clearance from a cardiologist and a

25   pulmonologist who examined plaintiff to determine whether he was fit for surgery.

26   /////

1  **I.   Facts[1]**

2  Plaintiff was an inmate at the time, incarcerated at the California Medical Facility

3  ("CMF").  Defs.' Mot. for Summ. J., Ex. A, Condensed version of Deposition of Plaintiff  ("Pl.'s

4  Dep." ), at 12:1-9.

5  Defendant Dr. Andreasen was the Chief Medical Officer ("CMO") at CMF.  Defs.' Mot.

6  for Summ. J., Attach. 1, Defs.' Stmt. of Undisp. Facts ("SUF"), 2.  Defendant Khoury was the

7  Chief Deputy Warden of Clinical Services ("CDWCS").[2]  *Id*.  Defendant Grannis was the Chief

8  of Inmate Appeals.  *Id*.  Defendant Peters was an Inmate Appeals Examiner for the California

9  Department of Corrections and Rehabilitation ("CDCR").  *Id*.

10  As CMO at CMF, defendant Dr. Andreasen oversaw the care and treatment of inmate

11  patients, supervised the prison medical staff, and investigated and responded to inmate appeals.

12  SUF 4.  He also acted as Physician Advisor to the nurses who staff the Utilization Management

13  Office ("UM") at CMF.  *Id*.  The UM Office receives and processes requests for medical

14  treatment (termed "Consultant Record/Request for Services").  As the Physician Advisor,

15  defendant Dr. Andreasen directed the approval or denial of such requests.  *Id.*

16  Plaintiff is a 55-year-old male with a long history of various ailments, including severe

17  back pain due to extremely degenerative disc disease.  SUF 5 & Ex. D at 1.  On April 27, 2001,

18  Dr. Capozzoli at CMF requested that plaintiff be given a neurosurgical evaluation for his back

19  pain at Queen of the Valley Hospital (QVH), in Napa.  SUF 6; Pl.'s Mot. for Summ. J., Decl. in

20  Supp. Thereof ("Pl.'s Decl."), at ¶ 5.  Dr. Andreasen approved this request and recommended

21

22  [1]  Unless otherwise noted, the facts are undisputed and contained within defendants'
23  Statement of Undisputed Facts ("SUF") filed August 11, 2006.

24  [2]  Defendants note that plaintiff first testified that Khoury is named in the complaint
because he was the direct supervisor of defendant Dr. Andreasen.  Pl.'s Dep., at 29: 3-23.
Plaintiff now disputes this and submits evidence that defendant Khoury signed approvals for
25  plaintiff's December 12, 2002, pre-op appointment and December 19, 2002, surgery, which was
cancelled.  Pl.'s Resp. to Defs.' Stmt. of Undisp. Facts ("Pl.'s Resp. SUF"), at 2; Defs.' Mot. for
26  Summ. J., Ex. C, Decl. of Andreasen ("Andreasen Decl."), Ex. F.

2

that plaintiff be seen by Dr. Morgese, a neurosurgeon at QVH.  *Id.*  Dr. Morgese, however, was unable to see plaintiff until much later due to "extreme back log and upcoming bilateral carpal tunnel release surgery" in August 2001, with three months' recovery time and potential return to treating patients and performing surgery in November or December, 2001.  SUF 6; Andreasen Decl., Ex. B, at 1.  Thus, Dr. Andreasen scheduled plaintiff for an appointment on September 27, 2001, with a different neurosurgeon, Dr. Remington, in Modesto, California.  SUF 6.

Dr. Remington examined plaintiff and requested a discogram and a Magnetic Resonance Image ("MRI") be taken of plaintiff's lumbar vertebrae.  SUF 7.

In January 2002, Dr. Altchek of CMF ordered an MRI of plaintiff's lumbar, which was completed on March 13, 2002.  *Id.*

On March 13, 2002, defendant Dr. Andreasen approved plaintiff for a follow-up appointment with Dr. Remington.  SUF 9.  The discogram was completed on May 15, 2002, at Doctors  Medical Facility in Manteca, and the results were sent to Dr. Remington.  SUF 10.  On May 22, 2002, plaintiff was seen for a follow-up appointment with Dr. Remington.  SUF 11; Pl.'s Decl., at ¶ 6.  Dr. Remington did not have the MRI results available, but reviewed plaintiff's discogram.  SUF 11.  At this time, Dr. Remington noted that plaintiff had "extremely degenerative disc disease at 2/3 with concordant pain" and "degenerative disc disease at L 3/4 with atypical but severe pain."  Andreasen Decl., Ex. D, at 1.  Dr. Remington recommended that plaintiff undergo a surgical procedure to fuse his posterior lumbar at L2/3 and L3/4.  *Id.*  Dr. Remington noted plaintiff's complicated medical history and requested a thorough medical clearance before commencing with surgery.  SUF 11; Andreasen Decl., Ex. D, at 2.

On June 26, 2002, Dr. Andreasen met with the UM nurse to discuss obtaining the necessary medical evaluation to assess plaintiff's suitability for back surgery.  SUF 12.  As part of that evaluation, defendant Dr. Andreasen referred plaintiff for a cardiology consult to ascertain his risks in undergoing back surgery considering his history of coronary artery disease. *Id.*  Plaintiff states that on July 25, 2002, Dr. Andreasen ordered an internal medical clearance

1   prior to surgery with CMF doctors N. Aguilar and Anderson.  Pl.'s Decl., at ¶ 7.  Plaintiff was

2   also scheduled for a consultation with Dr. Dassah, a cardiologist in Vacaville, CA.  SUF 12.

3        Due to prison lockdowns and scheduling difficulties, plaintiff did not see Dr. Dassah

4   until October 25, 2002.  SUF 13.  Dr. Dassah examined plaintiff and requested a full pulmonary

5   consultation.  *Id.*  On October 29, 2002, defendant Dr. Andreasen approved plaintiff for a

6   pulmonary consultation.  *Id.*  Plaintiff was evaluated by Dr. Healy, a pulmonologist, on

7   December 9, 2002.  SUF 14; Andreasen Decl.,  Ex. B, at 3; Pl.'s Decl., at ¶ 8.  Dr. Healy cleared

8   plaintiff for surgery.  Pl.'s Decl., at ¶ 8.  Dr. Healy's notes from that date conclude, "[a]s regards

9   the appropriateness of this patient undergoing general anesthesia for back surgery, I think he

10  would be an appropriate candidate for general anesthesia.  My only recommendation would be

11  that the patient receive bronchodilators immediately prior to the general anesthesia."  Andreasen

12  Decl., Ex. B, at 9.  Between plaintiff's evaluations by Dr. Dassah and Dr. Healy, on November

13  25 and 28, 2002, defendants Andreasen and Khoury, respectively, signed a form authorizing

14  plaintiff's pre-operative appointment and surgery with Dr. Remington.  Andreasen Decl., Ex. F.

15       On December 12, 2002, plaintiff was seen by Dr. Remington, who asked plaintiff if he

16  was ready for surgery.  Pl.'s Decl., at ¶ 9.  Plaintiff stated that he was.  *Id.*  Dr. Remington sent a

17  letter addressed to the CMO at CMF that same day, stating that they planned on performing

18  surgery on plaintiff on December 19, 2002.  Andreasen Decl., Ex. E at 1.  This letter, however,

19  was not received by defendant Dr. Andreasen's office until December 18, 2002, the day before

20  Dr. Remington scheduled surgery on plaintiff.  SUF 18.  Dr. Andreasen did not read this letter

21  before December 19, 2002.  *Id.*  Dr. Andreasen was scheduled to meet with the UM nurse on

22  December 20, 2002, where she was going to present him with Dr. Healy's and Dr. Dassah's

23  reports.  Andreasen Decl., at ¶ 17.

24       On December 19, 2002, plaintiff was taken to Dr. Remington's office at Doctors Medical

25  Center for surgery.  SUF 17; Pl.'s Decl., at ¶ 10.  Plaintiff was placed under sedation and

26  prepped for surgery to correct defects in his spine.  Plaintiff's Verified Complaint ("Comp."), at

1.  As the surgeon was preparing to operate, he was ordered to stop the procedure, due to defendant Dr. Andreasen's decision to disapprove the surgery.  *Id.*  When plaintiff regained consciousness, he was informed that the surgery had been canceled, and he was taken back to CMF.  *Id.*

Defendants contend that the UM had no prior knowledge nor prior approval of the appointment.  Andreasen Decl., at ¶ 19 & Ex. B at 3.  Progress notes in plaintiff's chart state that the appointment was  "[a]pparently ... a 'pre-op' appt."  *Id.*  According to Medical Technical Assistant ("MTA") Holiganga, scheduler, "medical clearance 'done' as forwarded to Dr. Remington Dr. Healy's and Dr. Dassah's notes."  *Id.*  On December 19, 2002, UM discovered that plaintiff had been removed from the institution and transported to Doctors Hospital in Manteca for lumbar surgery.  *Id.*  Dr. Andreasen was informed of the transport and spoke with Dr. Remington, and according to Dr. Andreasen, the patient visit was to be terminated and plaintiff was to be returned to CMF.  *Id.*

Defendant Dr. Andreasen states that he had reservations as to whether plaintiff was a suitable candidate for such a high-risk surgery at this time.  Andreasen Decl., at ¶ 18.  In particular, plaintiff's numerous other health concerns (past history with renal cell carcinoma, coronary artery disease, diabetes, chronic obstructive  pulmonary disease, and obesity) presented serious complications.  *Id.*  There was a concern that plaintiff could potentially have kidney, heart, or lung failure during surgery.  *Id.*  Dr. Andreasen believed that further conservative care should be explored in treating his back pain.  *Id.*  Because of the potential risk and the fact that surgery does not necessarily guarantee pain relief, defendant Dr. Andreasen was of the professional opinion that surgery should be a matter of last resort.  *Id.*

In contradiction to the foregoing, plaintiff's medical records indicate that his transportation to his surgical appointment was authorized by defendants Andreasen and Khoury on November 25 and November 28, 2002, for the December 19, 2002, for "surgery L2-L4 fusion with Dr. Remington."  Andreasen Decl., Ex. F.  Both Dr. Andreasen and Khoury signed the

1  Request for Authorization of Temporary Removal for Medical Treatment, which states that the

2  reason for transport is "surgery L2-L4 fusion w/ Dr. Remington." *Id.*

3      Defendant Andreasen had no specific recollection of signing the transport authorization

4  form. Andreasen Decl., at ¶ 19. As a matter of practice, Dr. Andreasen receives 40-50 transport

5  authorizations and assumes that the information contained therein is correct when signing. *Id.* It

6  was Dr. Andreasen's understanding that plaintiff was going to be seen for a follow-up

7  appointment. *Id.* Dr. Andreasen first learned about the impending surgery on December 19,

8  when a UM nurse told him that plaintiff was getting prepped for surgery. *Id.* Dr. Andreasen was

9  immediately concerned. *Id.* He asserts that he had not approved the surgery because he did not

10  believe that plaintiff, at that time, was an appropriate candidate for surgery. *Id.* Furthermore,

11  Dr. Andreasen did not have an opportunity to review any of plaintiff's pre-operation reports. *Id.*

12  Dr. Andreasen declares that, based on these two reasons, he directed Dr. Remington to cancel the

13  surgery. Andreasen Decl., at 5:2-4.

14      Plaintiff disagrees and points out that defendants' own documentary evidence suggests

15  that both Andreasen and Khoury authorized the pre-op visit for December 12, 2002, as well as

16  surgery on December 19, 2002, inviting the court's attention to Exhibit F of Dr. Andreasen's

17  declaration. Plaintiff states that, as CMO, it is Dr. Andreasen's responsibility to ensure that each

18  and every authorization is correct, not to assume that they are. Pl.'s Resp. SUF at 6.

19      Defendant Dr. Andreasen states that he fully explained to plaintiff the reasons for

20  canceling the surgery. Andreasen Decl., at ¶ 22. Plaintiff states that he did not meet with Dr.

21  Andreasen until four weeks had passed after the surgery was canceled. Pl.'s Decl., at ¶ 11. Dr.

22  Andreasen said that the surgery was canceled because he "did not have all of the consults

23  available needed prior to [illegible] surgery to allow the procedure to continue ... plus I had not

24  approved the actual surgery (consult) for treatment options had been requested and approved."

25  Andreasen Decl., Ex. G, at 1; Pl.'s Dep., at 24:5-25:8. Plaintiff contends that Dr. Andreasen

26  interrupted the prescribed surgery and the course of treatment recommended by Dr. Remington

due to Dr. Andreasen's wanting to save the CDCR money.  Compl., at 1.  Plaintiff contends that Dr. Andreasen told plaintiff that he had not approved the surgery, that the CDCR was in a money crisis, and that he wanted another opinion with Dr. Morgese.  Pl.'s Decl., at ¶ 11.  No record was made of this conversation, but it is mentioned in part in Dr. Andreasens' January 30, 2003, notes. Andreasen Decl., Ex. G at 1.  Dr. Andreasen further noted that "today we discussed his continued back problem.  The approach will be consult from PM&R Dr. Kessler for relief of discomfort and PT.  Dr. Morgese will [be] available for neurosurgical correction or if needed referral to UCSF for ortho/neurosurgical correction."  *Id.*

On June 5, 2003, plaintiff had a Neuro Clinic consult, the notes of which read, "still with pain ... discussed option: patient already on Neurontin.  We will try Methadone.  Discussed use of opiate prescription in detail– risks/benefits, etc."  Andreasen Decl., Ex. H.

Plaintiff was seen by Dr. Morgese on July 12, 2003, at which time Morgese's assessment did not differ from that of Dr. Remington.  Pl.'s Decl., at ¶ 12.  Morgese suggested however, that because of plaintiff's health problems, a more conservative approach should first be employed. *Id.*

Dr. Andreasen examined plaintiff again on September 22, 2003, and wrote in his notes that "patient has significant medical problems requiring further treatment and stabilizing prior to any neurosurgical intervention for back pain relief."  Andreasen Decl., Ex. I at 2.  Dr. Andreasen further noted that "[p]atient still requires relief of back pain.  He is being sent for 'chronic pain' evaluation at UCSF (Mt. Zion) ... Will at this time give cane and wheelchair chrono extensions." *Id.*

Plaintiff was seen at U.C. San Francisco Mount Zion Pain management ("UCSF") on January 4, 2004.  Pl.'s Decl., at ¶ 13.  They recommended Vioxx, which was later recalled from use on September 30, 2004.  *Id.*  Plaintiff was seen again at UCSF on March 8, 2004, for a steroid injection in his spine.  Andreasen Decl., at ¶ 25 & Ex. J at 2; Pl.'s Decl., at ¶ 14.  Plaintiff was very sick the following day.  Pl.'s Decl., at ¶ 14.

1    On May 12, 2004, plaintiff returned to UCSF for a second shot and again was severely ill

2    the following day.  *Id.*

3    On June 11, 2004, staff at Mt. Zion Pain Management Center noted that plaintiff was

4    treated there by receiving a facet steroid injection into his right side.  Andreasen Decl., Ex. J at 2.

5    At that time it was recommended that plaintiff continue with his current medication of Neurontin

6    and Tylenol #4 three times a day and that he return for a possible repeat facet joint injection if

7    the patient doesn't get benefit from the previous, and lumbar epidural steroid injection.  *Id.*

8    Defendants state, but do not provide support for the assertion, that plaintiff reported that the

9    epidural injections made him nauseated and he discontinued the treatments.  Andreasen Decl., at

10   ¶ 5; Pl.'s Dep., at 28:10-23.  Plaintiff disagrees, stating that there is nothing in defendant

11   Andreasen's Exhibit "J" to support Dr. Andreasen's statement.  Pl.'s Resp. SUF, at 8.

12   On August 5, 2004, plaintiff was examined by Dr. Chou, a neurologist with the

13   Department of Neurological Surgery at UCSF Medical Center, who noted that plaintiff claims he

14   has had pain in his back and right leg for four years, and that he has tried physical therapy and

15   epidural injections which have not helped.  Andreasen Decl., Ex. J at 4.  Dr. Chou observed that

16   plaintiff "has severe degenerative changes with motor endplate changes at L2-3 and L3-4" and

17   also has "mild-to-moderate stenosis at L2-3 and L3-4 with some lateral recess stenosis and

18   osteophytic ridging."  *Id.* at 5.  Dr. Chou recorded that

19       I have explained to [plaintiff] that surgery should be a last resort for back pain.  I
         explained to him that only if the back pain is so severe that it is completely
20       disrupting his life, should he undergo a fusion procedure.  I have explained to the
         patient that there are severe risks of surgery which include bleeding, infection,
21       paralysis, leakage of cerebrospinal fluid, need for more surgery, and no
         alleviation of the back pain.  Despite these risks, the patient still wishes to
22       proceed with surgery, and he will discuss this with his chief medical officer.

23   *Id.*  Plaintiff states that it was Dr. Chou's plan and assessment to operate.  Pl.'s Decl., at ¶ 15.

24   Dr. Andreasen eventually referred plaintiff to the University of San Francisco Medical

25   Hospital ("UCSF") for a surgical consult and surgery.  SUF 24; Andreasen Decl., at ¶ 6.

26   ////

On October 7, 2004, plaintiff filed a state tort claim with an explanation of late filing.  *Id.*
On November 2, 2004, plaintiff learned that his claim was denied.  *Id.* & Ex. D (Declaration of
Eleanor Machado).

Another consult on April 28, 2005, indicates an "increase in back pain ... wants to know
what is next step? Claims we all are doing nothing etc. ... Refused to get out of wheelchair for
exam and actually wheeled himself out saying he will refuse all prescriptions here, etc."
Andreasen Decl., Ex. I at 1.

On January 21, 2006, Dr. Chou recommended that plaintiff undergo a decompressive
laminectomy at L 2/3 and L 3/4 to decompress the nerve roots, and an L 2/3 interbody fusion to
address the back pain and degenerative arthritis in the spine.  SUF 27.  His assessment was the
same as it had been on August 5, 2004.  Pl.'s Decl., at ¶ 17.

At this point, all of the proper tests had been taken and plaintiff was given a 60% success
rate.  SUF 27.  Due to plaintiff's renal insufficiency and diabetes, he was advised of the
increased risk for renal failure and dialysis.  *Id.*  Despite the risks, plaintiff agreed to the surgery.
*Id.*  On March 21, 2006, after receiving authorization, plaintiff received spinal surgery.  *Id.*

Plaintiff declares that while meeting with Dr. Andreasen four weeks after the cancellation
of his surgery, Dr. Andreasen made reference to budgetary concerns for the cost of the first
scheduled operation.  Pl.'s Decl., at ¶ 19.  Plaintiff states that Dr. Andreasen states on different
occasions that budgetary issues were a bog concern.  *Id.*  When it later became apparent that the
conservative approach taken by him and other doctors at CMF was not working, he indicated
that surgery might be the only course of treatment.  *Id.*  However, Dr. Andreasen testified that
budgetary issues never factor into his decisions of whether or not to authorize surgery for an
inmate.  Andreasen Decl., at ¶ 28.  He testified that he is not involved in budgetary concerns in
the medical department, and as CMO, he is only concerned with giving the best care available to
his patients.  *Id.*

////

Plaintiff filed an inmate appeal on February 17, 2003, stating that he was not "satisfied with the explanation that was given to me on why the operation was halted or why Dr. Remington isn't going to be allowed to proceed with the operation after all the preparation that he did." Compl., Attach. at 3.  Defendant Khoury partially granted that appeal, stating that:

> although, CMF was temporarily using Dr. Remington for a short time during Dr. Morgese's absence, Dr. Morgese is the current contract holder.  All of this was explained to appellant during a lengthy meeting with Dr. Andreasen .... The preparation by Dr. Remington that appellant refers to in his appeal to the Second Level will be used by Dr. Morgese as a second opinion in his evaluation and recommendation process.

Attach. at 7.  Defendant Khoury concluded that, "[f]urther explanation for the disposition of Dr. Remington's evaluation has been explained in this appeal as a second opinion.  Portion of this appeal not granted is any inference by appellant to include additional information that has not already been made available."  *Id.*

Defendants Grannis and Peters handled plaintiff's Director's Level Review.  Compl. at 4; Attach. at 1.  Plaintiff added them to the complaint because he felt that they erred in denying his appeal and failed to interview him during the appeals process.   Pl.'s Dep., at 29:25-31:23; Defs.' Mot. for Summ. J., Ex. B.  Defendant Grannis denied plaintiff's appeal at the Director's Level, stating, "appellant was told his neurosurgeon would be the original contract doctor from Queen of the Valley Hospital, Dr. Morgese."  Compl., Attach. at 1.  Defendant Grannis also stated that plaintiff "has a heart condition that required cardiac clearance, hence the clearance had not been received and the first surgery was aborted."  *Id.*

## II.    Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district
> court of the basis for its motion, and identifying those portions of
> "the pleadings, depositions, answers to interrogatories, and

1   admissions on file, together with the affidavits, if any," which it
2   believes demonstrate the absence of a genuine issue of material
    fact.

3  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

4  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

5  judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

6  answers to interrogatories, and admissions on file.'"  *Id.*  Indeed, summary judgment should be

7  entered, after adequate time for discovery and upon motion, against a party who fails to make a

8  showing sufficient to establish the existence of an element essential to that party's case, and on

9  which that party will bear the burden of proof at trial.  *See id.* at 322.  "[A] complete failure of

10  proof concerning an essential element of the nonmoving party's case necessarily renders all

11  other facts immaterial."  *Id.*  In such a circumstance, summary judgment should be granted, "so

12  long as whatever is before the district court demonstrates that the standard for entry of summary

13  judgment, as set forth in Rule 56(c), is satisfied."  *Id.* at 323.

14          If the moving party meets its initial responsibility, the burden then shifts to the opposing

15  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

16  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

17  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

18  of its pleadings but is required to tender evidence of specific facts in the form of affidavits,

19  and/or admissible discovery material, in support of its contention that the dispute exists.  *See*

20  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate

21  that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under

22  the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec.*

23  *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

24  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

25  nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

26  ////

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

On April 12, 2005, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## III.   Analysis

Plaintiff alleges that defendants were deliberately indifferent to his need for back surgery and the prolonged attendant pain that he was in until the surgery was finally performed.  He

faults defendants for delaying adequate medical treatment by canceling, at the last possible moment, his approved and scheduled surgery.  Quite remarkably, the cancellation occurred after he was already under sedation and the doctor was about to operate.  Plaintiff alleges that budgetary concerns, not medical needs, motivated the cancellation.

He alleges that, after his aborted surgery, he saw Dr. Morgese, with whom CDCR has a contract, and that Dr. Morgese prescribed a more conservative approach to treatment that defendants should have known was ineffective.  All defendants assert that plaintiff has not produced evidence that would prove that they delayed adequate medical care and that the evidence shows instead that they took reasonable measures to treat plaintiff's condition.

### A.    Respondeat Superior Liability

As a threshold matter, defendants argue that plaintiff's claims against defendant Khoury are based solely on a theory of respondeat superior liability.

To state a claim against a supervisor who did not personally inflict the injury alleged, plaintiff must allege the supervisor (1) caused others to act, or knowingly refused to stop them from acting, knowing or having reasonable cause to know they would inflict injury; (2) approved such conduct and injury after the fact; or (3) so failed to train or control subordinates to avoid such injury as to demonstrate reckless or callous indifference to constitutional injury.  *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989); *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *see also*, *Jones v. Williams*, 297 F.3d 930, 937 & fn. 4 (9th Cir. 2002).

Here, plaintiff has not presented evidence to prove that defendant Khoury had knowledge of, participated in, or directed the alleged cancellation and delay of the needed surgery.  In fact, the only evidence that plaintiff has presented regarding defendant Khoury's involvement in the events underlying this action is that defendant Khoury signed the approval forms for the transportation of plaintiff to see Dr. Remington for pre-op and surgery appointments.  The court

1   therefore recommends that defendants' motion for summary judgment be granted as to defendant

2   Khoury.

3          **B.     Legal Standard for Eighth Amendment Claim**

4          In order to state a § 1983 claim for violation of the Eighth Amendment based on

5   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

6   deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct.

7   285, 292 (1976).  A determination of "deliberate indifference" involves an examination of two

8   elements: the seriousness of the prisoner's medical need and the nature of the defendant's

9   response to that need.  "Because society does not expect that prisoners will have unqualified

10  access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment

11  violation only if those needs are 'serious.'" *Hudson v. MacMillian*, 503 U.S. 1, __, 112 S.Ct.

12  995, 1000.  A "serious" medical need exists if the failure to treat a prisoner's condition could

13  result in further significant injury or the "unnecessary and wanton infliction of pain." *Gamble*,

14  429 U.S. at 104.  Either result is not the type of "routine discomfort [that] is 'part of the penalty

15  that criminal offenders pay for their offenses against society.' " *Hudson*, 503 U.S. at __, 112

16  S.Ct. at 1000 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The existence of an

17  injury that a reasonable doctor or patient would find important and worthy of comment or

18  treatment; the presence of a medical condition that significantly affects an individual's daily

19  activities; or the existence of chronic and substantial pain are examples of indications that a

20  prisoner has a "serious" need for medical treatment. *See, e.g., Wood v. Housewright,* 900 F.2d

21  1332, 1337-41 (9th Cir.1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200-01 (9th

22  Cir.1989).

23         Here, it is beyond dispute that plaintiff's medical needs were serious.  Indeed, they were

24  so serious that the defendants had already anaesthetized him and were poised to operate on his

25  spine.  The issue here is the second element, the nature of the defendants' response to that need.

26  ////

The conduct in question is the delay in or failure to provide needed surgery.  In assessing that delay here, the court is mindful that a prison official is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate."  *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Deliberate indifference "may be manifested in two ways.  It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."  *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).  When prison medical personnel act based on "a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law."  *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996).  Prison officials provide constitutionally inadequate care when they know that a particular course of treatment is ineffective, but they do not alter it in an attempt to improve treatment."  *See Jett v. Penner*, 439 F.3d 1091, 1097-1098 (9th Cir. 2006).

Significantly here, a medical need is serious if failure to treat the condition could cause further significant injury or the unnecessary and wanton infliction of pain.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).  Unnecessary continuation of pain may constitute the "harm" necessary to establish an Eighth Amendment violation from delay in providing medical care.  *Id*. at 1062.

While prison authorities have "wide discretion" in the medical treatment afforded prisoners, *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir.1967), *cert. denied*, 387 U.S. 922 (1967), a failure to provide treatment because of a tight budget constitutes a cognizable claim under § 1983.  *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986); *Cabrales v. County of Los*

1   *Angeles*, 864 F.2d 1454 (9th Cir.1988), *vacated*, 490 U.S. 1087 (1989), *reinstated*, 886 F.2d 235

2   (9th Cir.1989), *cert. denied*, 494 U.S. 1091 (1990).

3           **C.  Defendants' Motion for Summary Judgment**

4           Defendants motion for summary judgment argues that: (1)  plaintiff's § 1983 claim

5   against defendant Khoury is premised on a noncognizable respondeat superior theory of liability;

6   (2) plaintiff has failed to produce sufficient evidence to show that Dr. Andreasen was

7   deliberately indifferent to his serious medical needs; (3) defendants Grannis and Peters are not

8   liable to plaintiff for their roles in the inmate grievance process; and (4) plaintiff's state tort

9   claims are barred because he failed to comply with the claims presentation requirement of the

10  Tort Claim Act.

11          **1.  Claims against Defendant Dr. Andreasen**

12          Plaintiff claims that Dr. Andreasen acted with deliberate indifference to his serious

13  medical needs when he cancelled and then delayed plaintiff's surgery.  He claims that Dr.

14  Andreasen had already approved the surgery in writing.  He also claims that after the

15  cancellation, Dr. Andreasen set plaintiff on a course of ineffective treatment for more than three

16  years, during which time he endured severe pain.  It is undisputed that plaintiff was prescribed

17  surgical treatment to fuse vertebrae on two occasions, separated by approximately three years.  It

18  is also undisputed that Dr. Andreasen approved both surgeries, but cancelled the first after

19  plaintiff was already prepped and under anesthesia.  What is in dispute is defendants' reason for

20  doing so.  Defendants claim that the surgery should not have been approved, and was

21  disapproved at the last minute, because Dr. Andreasen had not yet reviewed reports from the

22  cardiologist and pulmonologist to clear plaintiff for surgery.  Plaintiff claims that his surgery was

23  approved by both defendants Andreasen and Khoury weeks before it was scheduled, and the only

24  reason it was ultimately cancelled was due to budgetary concerns, as later explained by Dr.

25  Andreasen.  Plaintiff attaches to his motion for summary judgment a copy of the Authorization

26  of Temporary Removal for Medical Treatment signed by Dr. Andreasen.

1    Plaintiff bears the burden of proof at trial to show that the defendant acted with deliberate

2    indifference to plaintiff's need for the surgery.  To withstand summary judgment, he may not rest

3    on the mere allegations or denials of his pleadings.  He must demonstrate a genuine issue for

4    trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he must do so with

5    evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

6    presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

7    Plaintiff alleges that defendant Dr. Andreasen cancelled his first planned surgery, after

8    approving it, due to budgetary concerns.  In his verified complaint, plaintiff states that defendant

9    Andreasen halted his surgery "due to his wanting to save the California Department of

10   Corrections money," and stated that the decision to do so was "above his head."  Compl., at 1.

11   Plaintiff testified that Dr. Andreasen informed him that "CMF was in a money crisis" and that

12   budgetary issues concerning the cost of his surgery were a "big concern."  Pl.'s Decl., at ¶¶ 11,

13   19.  By submitting evidence that Dr. Andreasen authorized plaintiff's removal for surgery, then

14   later claimed that he signed it without reading it and cancelled plaintiff's surgery after he was

15   already under anesthesia, plaintiff has demonstrated a genuine issue of material fact as to

16   whether Dr. Andreasen's decision was so beneath the norms of acceptable medical treatment that

17   it constitutes deliberate indifference to plaintiff's serious medical needs.  Moreover, plaintiff has

18   demonstrated a genuine issue of fact as to whether defendants' fiscal concerns motivated the

19   indifference to plaintiff's need for back surgery.  The court therefore recommends that

20   defendants' motion for summary judgment be denied on this ground.

21   A refusal to provide surgical treatment for an inmate suffering from pain and disability

22   violates the Eighth Amendment of the Constitution even where the inmate's condition does not

23   "pose imminent danger of death or permanent disability."  *Jones*, 781 F.2d at 770-72; *see also*

24   *Johnson v. Clinton*, 763 F.2d 326, 328 (8th Cir.1985).  While an honest difference of medical

25   judgment would ordinarily not constitute deliberate indifference, *Sanchez v. Vild*, 891 F.2d 240,

26   242 (9th Cir.1989), a federal court is not required to blindly defer to the judgment of prison

1   doctors or administrators in determining whether there has been deliberate indifference to an

2   inmate's serious medical needs.  *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989) (citing

3   *Wood v. Sunn*, 852 F.2d 1205, 1211 (9th Cir.1988), *vacated on other grounds*, 880 F.2d 1011

4   (1989)).  Were the rule otherwise, the doctor's actions would be insulated from review.  The

5   Eighth Amendment duty to provide medical care applies to medical conditions that may result in

6   pain and suffering which serve no legitimate penological purpose.  *Estelle*, 429 U.S. at 103; *see*

7   *also McGuckin*, 974 F.2d at 1059 (delay in performing surgery resulted in needless infliction of

8   pain); *Wood v. Housewright*, 900 F.2d 1332 (9th Cir.1990) (with two judges holding prisoner

9   had stated an Eighth Amendment claim for pain inflicted by delay in treating injury, but

10  dismissing the claim on other grounds); *Hunt*, 865 F.2d 198 (delay in providing prisoner with

11  replacement dentures); *Jones*, 781 F.2d at 771-72 (hernia which results in pain, suffering, and the

12  inability to perform a prison job is a serious medical need which prison doctors may not ignore);

13  *Fields v. Gander*, 734 F.2d 1313 (8th Cir. 1984) (inmate suffering severe pain from infected

14  tooth).  An injury that a reasonable doctor or patient would find important and worthy of

15  comment or treatment, the presence of a medical condition that significantly affects an

16  individual's daily activities, or the existence of chronic and substantial pain are indications that a

17  prisoner has a "serious" need for medical treatment.  *McGuckin*, 974 F.2d at 1059-60.

18          Plaintiff suffered for at least six years from severe pain due to extreme degenerative disc

19  disease and defendants do not and cannot seriously dispute that fact.  Andreasen Decl., Ex. C at

20  2, 11; Ex. D at 1; Ex. G at 5; and Ex. J at 5.  Plaintiff obviously had a "serious" need for medical

21  treatment.  *Wood,* 900 F.2d at 1337-41; *Hunt*, 865 F.2d at 200-01.  His long history of suffering

22  from back pain is also undisputed.  Andreasen Decl., at ¶ 7 & Ex. D, at 1.

23          The dispute here is whether the delay in plaintiff's ultimate surgical correction for his

24  degenerative disc disease is unconstitutional.  He was evaluated as having extreme degenerative

25  disc disease and being in "severe physical pain."  Andreasen Decl., Ex. D, at 1.  He was

26  prescribed various combinations of painkillers to treat his chronic back pain, including

1   constitutes #4, Neurontin, Methadone, and Vioxx, until it was recalled.  Andreasen Decl., Ex. J,

2   at 2 and Ex. H; Pl.'s Decl., at ¶ 13.  He was later given steroid injections into his spine to

3   alleviate his pain.  Andreasen Decl., at ¶ 25 & Ex. J, at 2; Pl.'s Decl., at ¶ 14.  Dr. Remington

4   recommended and scheduled surgery in 2002.  Andreasen Decl., at ¶ 27 & Ex. D, at 1.  Dr. Chou

5   recommended surgery on August 4, 2005.  Pl.'s Decl., at ¶ 17.  Dr. Chou again recommended

6   surgery on January 21, 2006.  Andreasen Decl., at ¶ 27.  Plaintiff ultimately had surgery on

7   March 21, 2006.  Andreasen Decl., Ex. K, at 7.  The dispositive question on this summary

8   judgment motion is whether the three intervening years between plaintiff's scheduled surgeries is

9   a delay in treatment that rises to the level of indifference constituting an Eighth Amendment

10   violation.

11         Prison officials violate their constitutional obligation only by "intentionally denying or

12   delaying access to medical care."  *Estelle*, 429 U.S. at 104-05.  Moreover, a delay in surgery to

13   treat an injury does not constitute deliberate indifference unless the delay causes further harm.

14   *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir.1985) (per curiam)

15   (delay in surgery for injured knee).  Unnecessary continuation of pain may constitute the "harm"

16   necessary to establish an Eighth Amendment violation from delay in providing medical care,

17   *McGuckin*, 974 F.2d at 1062.  Here, there is no question that Dr. Andreasen intentionally halted

18   the surgery and delayed it for a prolonged period of time.  Likewise, there is no question that the

19   years of delay subjected the plaintiff to protracted and severe pain.  It cannot be seriously argued

20   that the delay did not cause harm in the form of prolonged and severe back pain.

21         Dr. Andreasen testifies in his declaration that he delayed plaintiff's surgery for sound

22   medical reasons, but he does not demonstrate why, after plaintiff had been cleared for surgery by

23   a cardiologist and pulmonologist, he was of the opinion that plaintiff was not a good candidate

24   for surgery.  Attempts to explain the decision to halt the operation as plaintiff was sedated on the

25   operating table are seriously undermined by the earlier decisions of the medical team that the

26   intractable pain warranted surgical intervention and that plaintiff was an appropriate candidate

for surgery.  Nor does Dr. Andreasen convincingly, let alone conclusively, explain why more than three years passed without plaintiff receiving the surgery that Doctor Remington was prepared to perform. It certainly has not been shown that defendants are entitled to judgment as a matter of law on whether this delay was the result of indifference. The surgery was scheduled and poised to commence precisely because the medical team had found that plaintiff spinal condition was causing protracted, severe and intractable pain.  A reasonable jury could find on the evidence presented that the failure to go forward and the ensuing three year delay resulted in unnecessary and wanton infliction of pain.  *McGuckin*, 974 F.2d at 1062.

Finally, plaintiff testifies that Dr. Andreasen spoke of budgetary concerns as a roadblock to plaintiff's surgery.  Whether legitimate medical considerations or other factors account for the delay is for the jury to determine.  If a jury finds that the failure to provide necessary medical treatment was the result of tight budget constraints it could reasonably rely on that to conclude that there was deliberate indifference here.  *Jones v. Johnson*, 781 F2d at 771.  The evidence here is sufficient to create a triable issue of fact as to whether Dr. Andreasen acted with deliberate indifference.  *See Farrow*, 320 F.3d 1235, 1246-47 (11th Cir.2003) (triable issue of fact existed as to deliberate indifference, where plaintiff prisoner suffered a "substantial and inordinate delay" in receiving dentures and his dentist was aware he was experiencing pain, bleeding gums, and weight loss due to lack of dentures); *Hunt v. Dental Department*, 865 F.2d 198, (9th Cir. 1989) (defendant prison medical administrator, dentist, and medical assistant not entitled to summary judgment on plaintiff prisoner's Eighth-Amendment claim arising from a three-month delay in receiving dentures, where defendants knew the lack of dentures was causing severe pain, weight loss, and permanent damage to plaintiff's teeth)*; Hathaway v. Coughlin*, 841 F.2d 48, 50-51 (2d Cir. 1988) (reversing summary judgment in favor of defendant prison administrators on plaintiff prisoner's claim that defendants acted with deliberate indifference in causing a delay of over two years in arranging for surgery to correct broken pins in plaintiff's hip).   The court therefore recommends denying defendants' motion for summary

1   judgment on this basis.

2   **2.  Claims against Defendants Grannis and Peters**

3   Plaintiff alleges that defendants Grannis and Peters ratified Dr. Andreasen's

4   unconstitutional conduct by upholding the denials of plaintiff's appeals.  He seeks to hold these

5   defendants accountable on a ratification theory; that is, on the basis that these defendants were

6   deliberately indifferent to his medical needs because they denied his appeal of Dr. Andreasen's

7   cancellation of his surgery.

8   To prevail against defendants sued in their individual capacity plaintiff must show that

9   they personally participated in the alleged deprivation of constitutional rights; knew of the

10  violations and failed to act to prevent them; or implemented a policy that repudiates

11  constitutional rights and was the moving force behind the alleged violations.  *Larez v. City of Los*

12  *Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989);

13  *Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989).  "Although a § 1983 claim has been described as 'a

14  species of tort liability,' *Imbler v. Pachtman*, 424 U.S. 409, 417, it is perfectly clear that not

15  every injury in which a state official has played some part is actionable under that statute."

16  *Martinez v. State of California*, 444 U.S. 277, 285 (1980).  "Without proximate cause, there is no

17  § 1983 liability."  *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996); *see also*

18  *Williams v. Ellington*, 936 F.2d 881, 884-885 (9th Cir. 1991).

19  Here, plaintiff has only shown that Peters, Inmate Appeals Examiner, and Grannis, Chief

20  of Inmate Appeals, denied his appeal.  Plaintiff provides no authority for a rule that anyone

21  involved in adjudicating grievances after the fact is per se potentially liable under a ratification

22  theory.  This is not to say that persons involved in adjudicating administrative disputes, or

23  persons to whom complaints are sometimes made, can never be liable under a ratification theory.

24  But plaintiff provides no basis for showing that these two defendants knew that Dr. Andreasen

25  was wrong (if, indeed, he was) to cancel the needed surgery and that the resulting delay would

26  harm plaintiff.  Simply because plaintiff did not prevail on the appeals, even if he should have,

1   does not equate with a violation of his Eighth Amendment rights by those who adjudicated the

2   appeals.  Nor does it establish a causal connection between his Eighth Amendment claims and

3   either of the defendants who were involved in the appeal process.  The undisputed facts

4   demonstrate that neither of these defendants, officials engaged in reviewing and investigating

5   plaintiff's claims related to Dr. Andreasen's explanation for cancelling plaintiff's surgery, had

6   any involvement in the violation itself or were aware of plaintiff's medical condition at the time.

7   Defendants' motion for summary judgment as to defendants Grannis and Peters must be granted.

8   ### 3.  <u>Compliance with State Tort Claims Act</u>

9   Defendants argue that plaintiff has failed to comply with the claims presentation

10   requirements of the state Tort Claims Act, which requires that a claim be submitted to identify

11   with particularity the entities, individuals, and causes of action that plaintiff later alleges in his

12   complaint.  Defendants specifically argue that plaintiff never filed a claim under the Tort Claims

13   Act regarding the events of December 19, 2002.

14   A failure to present an administrative claim is fatal to a cause of action under this Act.

15   *Rivera v. City of Merced,* 2006 WL 3349576, at 4 (E.D. Cal. 2006) (*citing State v. Superior*

16   *Court (Bodde)*, 32 Cal.4th 1234, 1239  (2004)).  Under California law, a failure to file a required

17   claim warrants a grant of summary judgment.  *TrafficSchoolOnline, Inc. v. Clarke*, 112

18   Cal.App.4th 736, 738 (2003).  Plaintiff has the burden of showing either "satisfaction of the

19   statutory prerequisites or sufficient facts to sufficient facts to justify noncompliance on the

20   ground of excuse, waiver, or estoppel."  *Rivera*, 2006 WL 3349576 at 4 (*citing Bodde*, 32

21   Cal.4th at 1239) (essential element of cause of action); *see also* 1 CEB *California Government*

22   *Tort Liability Practice* § 5.18 (2006).  Plaintiff has not met that burden here.

23   Because plaintiff has failed to prove compliance with the state Tort Claims Act regarding

24   the events alleged in his complaint, defendants are entitled to judgment as a matter of law on

25   plaintiff's state tort claims.

26   ////

### C.     Plaintiff's Motion for Summary Judgment

Plaintiff also moves for summary judgment.  That motion must be denied for the same reasons discussed above regarding defendants' motion.  Defendants are entitled to summary judgment as to all claims except the claim that defendant Andreasen was deliberately indifferent to plaintiff's serious medical needs.  As previously explained, there is a genuine factual dispute over whether the doctor's halting of plaintiff's surgery and the ensuing delay in providing needed surgery constitute deliberate indifference to serious medical needs.

Accordingly, it is hereby RECOMMENDED that:

1.  Defendants' motion for summary judgment be denied as to defendant Andreasen and granted in all other respects as to all other defendants;

2.  Plaintiff's motion for summary judgment be denied; and

3.  That plaintiff be given 30 days to file and serve a pretrial statement and defendant Andreasen be given 15 days from the date plaintiff serves his pretrial statement to file his own pretrial statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 21, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE